**UNITED STATES of America,** **Plaintiff-Appellee,**

v.

**Ethan STANGLAND, Defendant-Appellant.**

**UNITED STATES of America,** **Plaintiff-Appellee,**

v.

**Max MUNK, Defendant-Appellant.**

Nos. 11738, 11739.

United States Court of Appeals Seventh Circuit.

April 3, 1957.

Robert E. Albright, Columbus, Ohio, Clifford E. Simon, Jr., Fort Wayne, Ind., for appellant.

Phil McNagny, Jr., U. S. Atty., Fort Wayne, Ind., Neil Brooks, Asst. Gen. Counsel, Donald A. Campbell, Atty., U. S. Dept. of Agriculture, Washington, D. C., J. Stephen Doyle, Jr., Atty., U. S. Dept. of Justice, Washington, D. C., John E. Logue, Asst. U. S. Atty., Northern District of Indiana, Fort Wayne, Ind., Robert W. Johnson, Attys., U. S. Dept. of Agriculture, Washington, D. C., for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendants appeal from judgments entered in suits by the United States to recover penalties claimed to be due as a result of wheat grown by them in excess of their farm marketing quotas, as defined by the provisions of the Agricultural Adjustment Act of 1938, as amended, 7 U.S.C.A. § 1281 et seq. As the two causes involve similar facts and identical issues of law, they have been consolidated for disposition.

As announced in Wickard v. Filburn, 317 U.S. 111, 115, 63 S.Ct. 82, 87 L.Ed. 122, the general purpose of the Agricultural Adjustment Act, insofar as it relates to wheat, is to control production in order to avoid the problems resulting from deficits or surpluses. In furtherance of this objective, the Secretary of Agriculture is required to establish a national acreage allotment for each successive wheat crop, which, in turn, is apportioned among the farms of the nation. Secs. 1333, 1334. In addition, whenever in a given year the Secretary determines that the total crop will exceed normal production by more than 20%, a national marketing quota shall be established. Sec. 1335. The statute further provides for a referendum of farmers subject to the quota to determine whether they favor or oppose it. If more than one-third vote against it, the Secretary must suspend the operation. Sec. 1336. When the marketing quota is in effect, it is equivalent to the actual production of the acreage planted to wheat on the farm, less the farm marketing excess, which, in turn, is the normal or actual production of wheat, whichever is the lesser, in excess of the farm acreage allotment. Sec. 1340(1). Finally, while the marketing quotas are in effect, under the statute, any farmer who markets wheat in excess of his quota is subjected to a penalty.

In the cases before us, the national acreage allotment and a farm marketing quota having been established, each defendant was notified of his wheat acreage allotment, and, thereafter, of his marketing quota, his excess acreage of wheat, the normal yield per acre, and his marketing excess. Defendants, dissatisfied with their acreage allotments, filed applications to have them re-established by the local review committee, as provided by regulation. 18 F.R. 3163. After the committee had made a reallocation, defendants took no further steps questioning the action. They have not paid the resulting penalties imposed upon their farm marketing excess, or avoided them by storing their excess wheat under the regulations, or delivered such excesses to the Secretary of Agriculture.

To the Government's complaints, each defendant answered that he was neither directly nor indirectly engaged in interstate commerce, inasmuch as the excess wheat had been consumed on his farm, and, further, that he had in no way elected to accept any benefits under the Act. After sustaining objections to certain interrogatories submitted by de-

fendants, the district court granted plaintiff's motion for summary judgment.

The interrogatories alluded to were directed primarily to the methods used in determining the wheat acreage allotment, the normal yield per acre, and the farm marketing excess. They are set forth in detail in the opinion of the court. D.C., 137 F.Supp. 539. In other words, these inquiries had to do with issues wholly within the scope of the determination of the marketing quota by the review committee, in a *de novo* hearing, from which no appeal has been taken. In this respect the statute prescribes the procedure which may be followed in order to review the quota. Thus, if the farmer expresses dissatisfaction, the quota must be reviewed by the local review committee. Sec. 1363. Further, unless application for review is made "the original determination of the farm marketing quota shall be final." Both defendants complied with the initial requirement of proceeding before the committee. However, the statute adds that if a farmer is dissatisfied with the latter's determination, he may, within 15 days after notice of the findings, institute review proceedings in the appropriate United States District Court or in the State Court. Sec. 1365. This judicial review is limited to questions of law, and the findings of fact by the committee, if supported by evidence, are conclusive. Sec. 1366. In addition, the statute provides that: "Notwithstanding any other provision of law, the jurisdiction conferred by [this part] to review the legal validity of a determination made by a review committee pursuant to [this part] shall be exclusive. No court of the United States or of any State shall have jurisdiction to pass upon the legal validity of any such determination except in a proceeding under [this part]." Sec. 1367.

■ As previously indicated, no attempt was made by either defendant to obtain a review of the determination of the committee. Nevertheless, in these suits to enforce the penalty, which is necessarily equated to the farm marketing excess as found by the committee,

defendants, for the first time, attempted to attack collaterally the findings of the committee by means of interrogatories. Under the explicit language of the statute, the procedure provided is exclusive. Any other method, be it direct or indirect, is without sanction in law. See Lee v. Roseberry, D.C., 94 F.Supp. 324. Inasmuch as defendants were precluded from questioning the findings of the committee in these suits, the district court properly sustained plaintiff's objections to the interrogatories.

■ Defendants assert that summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. should not have been granted, arguing that the rules are not applicable because of the nature of these proceedings. It is quite clear that an action to collect the penalty provided by this Act is civil rather than criminal in nature. Mulford v. Smith, 307 U.S. 38, 45, 59 S.Ct. 648, 83 L.Ed. 1092; Shafer v. United States, 4 Cir., 229 F.2d 124, 129; United States v. West Texas Cottonoil Co., 5 Cir., 155 F.2d 463, 466; Usher v. United States, 4 Cir., 146 F.2d 369. In Usher, a suit to recover penalties for cotton grown in excess of an allotment, the court said, at page 371: "We are of the opinion that the judge below was correct in holding the action to be a civil one and not criminal * * *. The object of the Act and the Regulation was to prevent an over-production of cotton. It was not a crime to produce cotton in excess of the allotment, but if there was such over-production the penalty was imposed, not as a punishment for a crime but, to prevent over-production of the commodity. The grower was at liberty to produce all the cotton he wished to produce provided this penalty was complied with. The penalty differs from an ordinary penalty which is imposed in connection with the commission of an unlawful act * * *. It clearly follows that the action here is a civil and not a criminal one and that plaintiff had only to carry the burden of proof to the satisfaction of the jury."

■ In this respect, defendants contend further that these actions fall with-

in the exception set forth in Rule 81(a)(2), which provides *inter alia*, that: "In the following proceedings appeals are governed by these rules, but they are not applicable otherwise than on appeal *except to the extent that the practice in such proceedings is not set forth in statutes of the United States* and has heretofore conformed to the practice in actions at law or suits in equity; * * * *forfeiture of property for violation of a statute of the United States.*" (Emphasis supplied.) Defendants suggest that enforcement of the penalty amounts to a "forfeiture of property" within the meaning of the rule, and that, therefore, the rules of procedure are not applicable. We think the argument is misconceived. First, it is clear that these actions do not seek a "forfeiture of property" within the meaning of the provisions. Obviously this phrase connotes a proceeding in the nature of an "in rem" action. Here, the United States is merely seeking a money judgment as a result of failure to comply with the statute. As Prof. Moore says in his Federal Practice (2nd ed.), Vol. 2, page 12: "the action is essentially the same as the old common law action of debt on a statute." However, even if we were to assume, arguendo, that collection of penalties is a "forfeiture of property", nevertheless, the Rules of Civil Procedure still govern, for the reason that the Agricultural Adjustment Act prescribes no alternative procedure. Rule 81(a)(2) explicitly states that the rules are applicable even in an action for forfeiture of property for violation of a statute "to the extent that the practice in such proceedings is not set forth." Hence, we conclude that the rules are applicable and that, in the absence of any material issue of fact, summary judgments were proper.

It is urged that genuine issues of fact exist. As noted, defendants averred in their answers that, inasmuch as they consumed the wheat produced on their farms, they were not engaged in commerce, and further, that they had accepted no benefits under the Act. Though true, such facts do not raise an issue of fact. Wickard v. Filburn, 317 U.S. 111, 115, 63 S.Ct. 82, 87 L.Ed. 122.

■ Finally, defendants contend that the Act is unconstitutional as attempted to be applied to them, urging arguments identical with those presented in Wickard. In that case, a farmer sought to enjoin enforcement of the penalty imposed under the Act upon that part of his wheat crop in excess of his marketing quota and, in addition, sought a declaratory judgment that the quota was unconstitutional under the Commerce Clause and the Due Process Clause, Const. art. 1, § 8, cl. 3 and Const. Amend. 5. The Court observed that the intended disposition of the crops involved had not been covered in the stipulation of facts, but said at page 317 U.S. 118, 63 S.Ct. at page 86: "The question would merit little consideration since our decision in United States v. Darby, 312 U.S. 100, [657] 61 S.Ct. 451, 85 L.Ed. 609, sustaining the federal power to regulate production of goods for commerce *except for the fact that this Act extends federal regulation to production not intended in any part for commerce but wholly for consumption on the farm.*" (Emphasis supplied.) Clearly then, the Court had before it the exact factual situation presented to us, namely, the fact that the farm marketing excess never reached the market-place. Defendants' argument that the opinion in Wickard was based on estoppel is incorrect. In addition, the fact that in that case the farmer sought to enjoin collection of the penalty, whereas here the United States is seeking to recover the penalty, raises a distinction without a difference.

In Wickard, as is now legendary, the court held that whether the wheat itself was destined for interstate commerce was immaterial. Rather, the point of emphasis was on the economic effect of such intrastate activity on interstate commerce. At pages 125, 127, 128 of 317 U.S., at page 89 of 63 S.Ct., the Court said: "Even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress

if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.' * * * The effect of consumption of home-grown wheat on interstate commerce is due to the fact that it constitutes the most variable factor in the disappearance of the wheat crop * * *. That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial."

█ Defendants further insist that the penalty is really a tax, and, hence, that its levy and collection would violate Article I, Sections 7 and 9. To dispose of this argument, we need refer only to Rodgers v. United States, 6 Cir., 138 F. 2d 992, 994, 995 wherein it was noted that imposition of the penalty "as a prerequisite to the right of the farmer to market excess cotton under the terms and purposes of the statute involved is not the levying of a tax under the government's taxing power, but a method adopted by the Congress for the express purpose of regulating the production of cotton affecting interstate commerce. * * the constitutional limitation on which appellant relies relates solely to taxation generally for the purpose of revenue only, and not impositions made incidentally under the commerce clause exerted either directly or by delegation, as a means of constraining and regulating what may be considered by the Congress as permicious or harmful to commerce. The imposition with which we are here concerned has for its object the fostering, protecting and conserving of interstate commerce and the prevention of harm to the people from its flow. It is not a charge on property for the purpose of raising revenue."

█ Defendants urge that the Act violates the privileges and immunities clause of Article IV, Section 2. The gravamen of this argument is that the Act is not applied uniformly. The short

answer is supplied by Currin v. Wallace, 306 U.S. 1, 13, 14, 59 S.Ct. 379, 386, 83 L.Ed. 441: "We have repeatedly said that the power given to Congress to regulate interstate and foreign commerce is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution' * * *. To hold that Congress in establishing its regulation is restricted to the making of uniform rules would be to impose a limitation which the Constitution does not prescribe. There is no requirement of uniformity in connection with the commerce power, (Art. 1, sec. 8, ch. 3, Const.U.S. C.A.) such as there is with respect to the power to lay duties; imposts and excises."

█ The argument that the Act effects an unconstitutional delegation of legislative power is refuted by Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L. Ed. 1092, wherein it was established that the standards set forth in the statute are sufficient, as they are concisely and clearly defined.

█ It is urged that the Act encroaches upon Amendments Seven through Ten. Surely, the granting of a motion for summary judgment where there is no genuine issue of fact is not a denial of the right to trial by jury guaranteed by the Seventh Amendment. Fidelity & Deposit Co. of Maryland v. United States, 187 U.S. 315, 23 S.Ct. 120, 47 L.Ed. 194; Lindsey v. Leavy, 9 Cir., 149 F.2d 899. And, as already pointed out, these are suits to recover civil penalties; consequently, the Eighth Amendment argument is inapposite. Finally, as this is a clear exercise of the Commerce power, there is no encroachment on powers reserved to the states, for their sovereign power must, by force of the Constitution, give way and subordinate itself to the valid exercise of the Commerce power by the federal government. United States v. State of California, 297 U.S. 175, 184, 56 S.Ct. 421, 80 L.Ed. 567.

The judgments are affirmed.